**Exhibit**

**1**

## U.S. NATIONAL SUPPLIER AND PURCHASE AGREEMENT

**between**

**Circle K Procurement and Brands Limited**

**("CK Brands")**

**and**

**Goli Nutrition Inc.**

**("Supplier")**

**Effective Date:**
**January 1, 2022**

## U.S. NATIONAL SUPPLIER AND PURCHASE AGREEMENT

**BETWEEN:**                    **Circle K Procurement and Brands Ltd.,** with one of its principal locations at Circle K House, Beech Hill, Clonskeagh, Dublin 4, D04 Y016, Ireland

(hereinafter referred to as "CK Brands" or "Customer")

**AND:**                        **Goli Nutrition Inc.** with one of its principal locations at 1 Westmount Square, Suite 1500, Westmount, Quebec, H3Z 2P9, Canada

(hereinafter referred to as "Supplier")

(Customer and Supplier are sometimes hereinafter referred to collectively as the "Parties" and individually as a "Party")

**WHEREAS** CK Brands is representing and acting on behalf and for the benefit of the "Affiliated Companies", as defined below, (collectively along with CK Brands referred to "Customer" or "Customers") with respect to this U.S. National Supplier and Purchase Agreement ("Agreement");

**WHEREAS** CK Brands holds its authority and powers to represent and commit the Affiliated Companies pursuant to a Power of Attorney;

**WHEREAS** as of the Effective Date, (reflected on the cover page to this Agreement) Customers' United States network is comprised primarily of corporate stores under the "*Circle K®*" brands as well as other brands (the "Stores") and franchise stores operating under various brands (the "Franchisees"). The Stores and Franchisees are located in multiple states of the United States and are divided into business units (including any new Customer business units that may be created after the Effective Date (the "Divisions");

**WHEREAS** the Parties desire to establish a cooperative business relationship with each other focused on joint co-branding activities with the goal of generating sales and customer prospects;

**WHEREAS** the Parties agree to make use of each other's trademarks, service marks, trade names, brand names, slogans and logos (the "Marks") solely in connection with the advertisements, promotion, sales and distribution of the Products within the United States (the "Territory");

**WHEREAS** Customer, as owner of the Customer Marks, is willing to license certain Customer Marks to Supplier for the term of this Agreement, and Supplier is willing to license certain Supplier Marks to Customer for the term of this Agreement; and

**WHEREAS** the Parties desire to enter into this Agreement.

**NOW THEREFORE,** the Parties agree as follows:

## 1. SUPPLY

### 1.1    Products

Supplier shall sell and supply Customer with the products listed on <u>Schedule A</u> (the "Products").

In the event that Supplier provides Products that are consumables, (<u>Schedule C</u> entitled "Consumable Products - Supplier Responsibilities and Commitments") shall also apply to this Agreement.

### 1.2    Inventory

Supplier shall maintain an inventory and service level of Products at all times which will meet Customer's need for Products based on Customer's historical purchases and such other forecasts as Customer may from time to time provide to Supplier.  Failure to keep Customer's inventory in stock as required by the Agreement shall result in penalties to be paid by Supplier including without limitation lost profits (including any applicable rebates) and business interruption delays and associated costs.

Any material changes affecting the form, fit, or function of any Product that are initiated by Supplier must be sent in writing to Customer at least 90 days in advance and be approved in writing by Customer; Supplier shall be responsible for all related costs to such changes.  If said changes are not acceptable to Customer, Customer may terminate this agreement without any penalty of any kind.  Supplier shall also provide prompt written notice to Customer of the discontinuance of any Products.

For proprietary products (which shall be defined as any Product using or bearing both the Supplier and Customer's name, logo, or brand), the Customer may, at its sole discretion, decide to (a) cease offering one or more of the Product(s) in the Customer's Stores and/or (b) change the package materials or design of its Marks(s). In either of those events, or in the event of expiration or termination pursuant to Section 6 of the Agreement, Customer may purchase up to a maximum ninety (90) day supply, of finished goods of such Product(s).

### 1.3    Additional and Deleted Items

If Supplier introduces items for sale in the United States in addition to those listed on <u>Schedule A</u>, Supplier may offer such additional items for sale to Customer under this Agreement. Customer may, at its sole discretion, elect to add or delete such other items to the list of Products under Schedule A upon a thirty (30) calendar day prior written notice to Supplier. All additional products may be approved or rejected for any reason by any of the Customer's Business Units.

### 1.4    Customer Locations

Supplier agrees and acknowledges that Customer has the right to increase or decrease the number of Stores and Franchisees as may be deemed necessary in Customer's sole discretion.

### 1.5    Affiliates & Franchisees

For the purposes of this Agreement, "Affiliated Companies" shall include Circle K Stores Inc., Mac's Convenience Stores, LLC, RDK Ventures LLC, CST Diamond L.P., Bacon Grocery

Company LLC, Holiday Station stores, LLC, Erickson Petroleum, LLC, Independent Diversified Transportation, LLC, Holiday Diversified Services, LLC and TMC Franchise Corporation, as well as any of their affiliated and related entities, parents and subsidiaries that currently exist or may exist in the future.

The Supplier shall be obligated to make the Products available to Franchisees under the same terms and conditions of this Agreement.  In such event, Supplier shall establish a direct billing relationship with such Franchisees and shall arrange for the delivery of Products and payment of the same directly with such Franchisees. Customer shall have no responsibility or liability whatsoever with respect to any Products purchased or supplied to Franchisees by Supplier, and nothing in this Agreement may be construed as any assumption of liability, indemnification or guaranty by Customer with respect thereto. Under their franchising arrangements with Customer, Franchisees have authorized Customer to receive Rebates from their purchases, and accordingly Supplier acknowledges and agrees that Customer may, in its sole discretion, include purchases by Franchisees in any purchase total and Rebate calculations under this Agreement, and that notwithstanding anything to the contrary in any agreement made from time to time between Supplier and any one or more Franchisees, all Rebates with respect to Franchisees' purchases shall be paid directly to Customer hereunder. In no event shall any Franchisee be deemed a third -party beneficiary of this Agreement, nor shall Customer be deemed a third-party beneficiary of any agreement between Supplier and a Franchisee.

## 2.  STANDARDS OF QUALITY

### 2.1    High Standards

Supplier shall provide Products that meet or exceed industry standards and quality, which are free from any latent or patent defects in material or workmanship.  Furthermore, Supplier represents and warrants that all Products provided, processed, manufactured, sold, shipped or delivered under this Agreement will be, as of the date of shipment or delivery: (i) Not adulterated or misbranded within the meaning of Applicable Law; (ii) Free from defects and of merchantable quality and fit for its intended purpose (iii) purposes for which goods of the same nature and description would ordinarily be used; (iv) In compliance with Applicable Law, including all safety, health, product identification, labelling and packaging standards and specifications; and (v) Packaged in accordance with the specifications set forth in this Agreement or, if such specifications are not set forth herein, in such a way as is necessary in order to reasonably protect and preserve the Products, all in accordance with local law where such Products are delivered to Customer.

For proprietary products, prior to producing Customer branded food items, Supplier must obtain Global Food Safety Initiative (GFSI) certification and maintain passing (>85%, B, or Good) Score. Supplier shall provide written evidence of such certification to Supplier and maintain such certification throughout the Term of the Agreement.  If the Supplier wishes to make any changes to the product specifications and/or any ingredients ("Product Modifications"), the Customer must receive no less than thirty (30) days advance written notice of such Product Modifications, including detailed information about, and the rationale for, the subject Product Modifications.  Prior to the implementation of any Product Modifications, Supplier must receive Customer's express approval, which approval may be delayed if Customer (in its sole discretion) determines it has not been provided with sufficient information from Supplier in support of the Product Modifications. Furthermore, Customer's approval of the Product Modifications may be withheld if Customer determines (in its sole discretion) that the Product Modifications are unsatisfactory.

### 2.2    Returns / Defects

Neither Customer's audit and/or inspection rights under this Agreement, nor the fact that Supplier has sent goods or samples for Customer's inspection, shall limit the Supplier's responsibility for ensuring that the Products are in compliance with the contractual and Applicable Law.

Upon notice from Customer, Supplier shall take back and remove, at its own cost and expense, all Products which do not meet the specifications set forth in Schedules attached hereto (if any), the standards and representations and warranties, and/or that Customer believes will have a material adverse impact under this Agreement and shall reimburse (or credit) Customer for the full cost of such Products. Upon taking back or removing defective Products, Supplier shall provide replacement Products to Customer within a mutually agreed timeframe.

Where applicable, Customer is entitled to remedy the defective Products itself or employ a third party to do so at Supplier's expense and cost or to reduce the contract price accordingly as mutually agreed with the Supplier. The same shall apply if awaiting Supplier's remedy will cause any financial damages to Customer. In such event, Customer shall provide Supplier with a thirty (30) calendar day prior notice before initiating the rectification work.

In the event of any recall, market withdrawal, stock recovery, or similar action (each, a "retrieval"), regarding any Product previously purchased and distributed hereunder, Supplier shall promptly notify Customer of any such retrieval. Further, if Supplier is notified by any government agency or by one of its suppliers of the possibility of a retrieval, Supplier shall promptly notify Customer of the same. Supplier shall reimburse Customer for all reasonable costs and expenses involved in any retrieval, including, without limitation, (i) handling and preparing the Product for reshipment to Supplier or its designee, (ii) destroying the Product, if necessary, and (iii) replenishing inventory as a result of the Product's removal, return or necessary destruction.

Supplier agrees to provide a full credit (including any shipping, repair costs, etc.) for all expired Product or Product that does not meet Customer's specifications as described within Section 2.1, provided that all Stores and Franchisees follow standard inventory practices. Such credit shall be due within fifteen (15) days of Supplier receiving notice from Customer.

## 3.    ORDERS AND DELIVERY

### 3.1    Customer Requirements

All orders and delivery shall meet the respective Division's requirements, as agreed to by Supplier and each Division.

### 3.2    Delivery, Passing of Risk and Title to Products

If Supplier controls the distribution to the Stores or Franchisees and should have cause to believe that it will be unable to meet the agreed upon delivery schedule or any milestones set forth in this Agreement, it shall promptly notify the Customer in writing stating the reason for the delay, the effect on the agreed upon delivery schedule and include a proposal on how the delay can be minimized. Unless otherwise agreed, delivery shall be deemed to have taken place when the Products have been handed over to Customer or Franchisee according to the agreed upon delivery terms, conditions and location. Title of the Products shall pass to Customer or Franchisee at the time of delivery.  Therefore, in circumstances where Supplier controls the distribution to the Stores, Supplier shall bear the full risk of the Products until such Products have been satisfactorily delivered to Customer or Franchisee.

DocuSign Envelope ID: 5F4D14B3-33F5-4FAA-83B2-A5F75A57B342

### 3.3 Force Majeure

Neither Customer nor Supplier shall be liable for delay or failure to perform, in whole or in part, any of the agreements or obligations set forth in this Agreement due to contingencies beyond its control, including, but not limited to labor disturbances (including strikes and lockouts), war or national emergency, epidemics, quarantines, acts of God, hurricanes, fire, storms, accidents, government regulation or interference, riots, terrorism or any other cause beyond its control (collectively, "Force Majeure"). A Party claiming that its performance is delayed by Force Majeure shall give the other Party immediate notice of the occurrence causing the delay. The inability to obtain financing or lack of money shall not constitute Force Majeure, and this provision shall not excuse non-payment of monies hereunder.

## 4. PRICING AND REBATES

All prices and costs for the Products are as stated on the attached <u>Schedule A</u>.

### 4.1 Price

The prices reflected on Schedule A shall remain in effect during the Term. Customer cannot sell Products below Minimum Retail Price (MRP), but has the flexibility to sell above MRP. Customer must sell at MRP, in order to qualify for the Guaranteed Obligation as defined in Schedule A. Supplier consents to Customer offering mutually agreed promotions such as loyalty programs, multi-pack discounts, etc

### 4.2 Competitive Offerings

Supplier agrees it shall provide competitive prices for its Products and to offer the comparable net prices for its Products that it offers to any other customer of Supplier in the same channel of trade, as well as dollar and drug channel, purchasing the Products under similar circumstances including without limitation, similarity in purchase volumes and terms and conditions to ensure the prices remain competitive.

### 4.3 Rebates

If applicable, Supplier shall pay Customer the "Rebate Pricing" described on <u>Schedule B</u> attached hereto and by reference made a part herein (the "Rebates").

### 4.4 Rebate Payment and Set Offs

Intentionally omitted.

### 4.5 Term Equalization

Intentionally omitted.

## 5. INVOICING AND PAYMENTS

If Supplier controls the distribution to the Stores: (a) Customer agrees to pay Supplier any undisputed invoices net thirty (30) calendar days received at Customer's respective Divisions:(b) Supplier shall provide directly to Customer invoices containing all necessary details, including the Rebates as applicable, for each purchase order for Products ordered from Supplier; and (c) Customer reserves the right to withhold disputed payments of portions of an invoice, if it reasonably believes it to be inaccurate, without penalty (loss of incentives/rebates, etc.) or late fees. Notwithstanding the foregoing, Customer will not be responsible for paying any Supplier

DocuSign Envelope ID: 5F4D14B3-33F5-4FAA-83B2-A5F75A57B343

invoices that are submitted six (6) months or more after delivery of Product(s). Undisputed amounts not paid by Customer when due shall be subject to interest at the rate of eighteen percent (18%) per annum or the maximum interest rate permitted by law, whichever is the lesser.

Notwithstanding anything to the contrary in this Agreement the Supplier will undertake to implement all technological changes implemented by the Customer in accordance with standards submitted by an industry association (EDI, GS1, etc.).

## 6.   TERM & TERMINATION

The term of this Agreement shall be from **January 1, 2022** until **December 31, 2023** (the "Term"), with an option to renew for an additional one (1) year period upon mutual agreement of the Parties, subject however to the following conditions.

Upon expiration of the Term, this Agreement will continue on a month-to-month basis until terminated by either Party upon not less than thirty (30) days prior written notice to the other Party.

Notwithstanding anything in this Agreement to the contrary, Customer may terminate this Agreement at any time, with or without cause, and without any penalty, upon thirty (30) days prior written notice to Supplier.

Upon expiration or termination of this Agreement for any reason:

> **(a)**     each Party shall promptly pay the other all undisputed amounts due with respect to Products sold and delivered prior to termination; and

> **(b)**     if Products bear any Intellectual Property of Customer, Customer will be responsible to purchase up to a maximum ninety (90) day supply of finished goods of such Product(s) as specified in Section 1.2.

In addition, upon termination or expiration of this Agreement, each Party will use commercially reasonable efforts to assist the other Party in carrying out and effectuating the termination of this Agreement as may be necessary for the orderly, non-disrupted business continuation of each Party.

## 7.   DEFAULT, INSOLVENCY AND BREACH

For purposes of this Agreement, a Party is in "Default" if such Party:

> **(a)** fails to perform any material obligation under this Agreement; or

> **(b)** fails to provide reasonable assurances of solvency upon written request by the other Party, suspends or discontinues business operations, makes an assignment for the benefit of creditors, commences voluntary or has commenced against it involuntary bankruptcy proceedings, or voluntarily appoints or involuntarily has appointed a receiver or trustee of all or any part of their property, or has an involuntary lien filed or levied against, or foreclosure or seizure of a material portion of its assets, including inventory, by a creditor, lienholder, lessor, governmental authority or other person; or

> **(c)** violates the Confidentiality provisions of this Agreement which results in a loss to the other Party;

DocuSign Envelope ID: 5E4D14B3-33F5-4FAA-83B2-A5F75A67B343

**(d)** violates any Applicable Laws; or

**(e)** commits any act or omission which is unsafe, illegal, criminal or fraudulent.

In the event a Default specified in (a) above has occurred, the non-defaulting Party shall send the defaulting Party a written notice identifying the Default and requesting that such Default be cured within thirty (30) calendar days.

If the defaulting Party remains in Default after the thirty (30) calendar day cure period, the non-defaulting Party is entitled to all rights and remedies available under this Agreement or at law or in equity, including, without limitation, the right to terminate this Agreement by written notice to the defaulting Party. For purposes of this Agreement, "cure" means complete corrective action and the payment of all undisputed fees, expenses and costs incurred by the non-defaulting Party as a result of the other Party's default.

In the event a Default specified in (b) – (e) above has occurred, the non-defaulting Party may immediately terminate this Agreement upon written notice to the defaulting Party.  Further, the non-defaulting Party shall be entitled to all rights and remedies available under this Agreement or at law or in equity.

Upon delivery of a written notice of termination this Agreement will immediately terminate and relieve all further obligations, except for those which by their nature are intended to survive the expiration or termination of this Agreement, including the obligation by Supplier to pay rebate amounts owed.

## 8.  ENVIRONMENTAL, ETHICS AND SECURITY

Supplier undertakes to provide Products, which pose no threat or danger to the environment and which have been manufactured or assembled in conditions respectful of human rights, including but not limited to, slavery and human trafficking.

Supplier shall use all due care and diligence to maintain the security of its business (Including but not limited to its computer/data systems) consistent with industry standards and Applicable Laws. In the event there is a perceived, threatened or actual breach in Supplier's computer/data systems, Supplier must comply with all Applicable Laws and must give Customer immediate notice of such incident irrespective of whether Customer's data has been compromised. Following such incident, Supplier will reasonably cooperate with Customer to ensure the security of Customer's data within Supplier's systems and in Customer's investigations regarding the incident, and Supplier will share with Customer the results of any investigation undertaken for the benefit of Supplier.

## 9.  REPRESENTATIONS AND OTHER AGREEMENTS

### 9.1    Validity of Both Parties

Each Party represents and warrants it is duly organized, validly existing and in good standing under the laws of the place of its origin and possesses all the necessary authority to enter into and perform its obligations under this Agreement.

**9.2     Confidentiality and Proprietary Data**

The Parties agree that any information obtained by either of them under this Agreement or in the course of performance under this Agreement shall be treated as confidential/proprietary and shall not be used or disclosed to any other person or entity except as may be required by law or with the other Party's prior written consent. If either Party is required to disclose any confidential/proprietary information in connection with any legal or administrative proceeding or investigation such Party will immediately notify the other Party of such request so that it may seek a protective order or other remedy or waive compliance hereunder. Unless or until any such confidential information becomes public by no action or omission of Supplier, the provisions of this Section shall survive expiration or termination of this Agreement.

**9.3     Grant of License**

Subject to the terms and conditions of this Agreement, each Party grants the other Party a limited, royalty-free, non-exclusive, non-transferable license to use its Marks solely in connection with the co-branding activities specified in this Agreement,

Neither Party will use or permit others to use the other Party's Marks except as permitted in this Agreement nor for any purpose other than in connection with the join co-branding activities without the prior written consent of the other Party. Neither Party will use or permit the Marks of the other Party to be used in any manner that would dilute or adversely affect the value and distinctiveness of the Marks or that would disparage, embarrass or be detrimental to the licensing Party or in any way use or take any action that may associate the Marks with any illegal, offensive, obscene, immoral, or improper purpose or action. Each Party agrees, subject to the terms and conditions of this Agreement, that any and all rights that may be acquired by its use of the other Party's Marks shall inure to the sole benefit of the other Party.

**9.4     Ownership**

Each Party agrees that all rights, title, and interest in the other Party's Marks and any intellectual property of the other Party shall remain vested in the other Party and that this Agreement does not transfer ownership of any of these rights. Each Party shall notify the other Party promptly of any actual or threatened infringements, imitations or unauthorized use of the other Party's Marks or intellectual property by third parties of which such Party becomes aware. Each Party shall cooperate with the other, at its request, in connection with any action brough the other Party. Each Party agrees not to challenge, oppose, petition to cancel or otherwise attach the other Party's Marks or intellectual property and the other Party's ownership thereof.

**9.5     Quality and Use of Marks**

Each Party will comply with the other Party's guidelines or conditions provided to it with respect to style, appearance, and manner of use of the Marks and will obtain other Party's consent prior to using the Marks in a manner that deviated from such guidelines and conditions, provided that such consent may withheld by the other Party for any reason.  In addition, upon the other Party's request, each Party will promptly provide the other Party with specimens of the marketing materials, products, or other use that incorporate the Marks to monitor compliance with this Agreement.

### 9.6    Litigation and Regulatory Matters

Each Party agrees to notify the other Party in writing by personal deliver, facsimile or by email within five (5) days following (i issuance of any order, notice, injunction, or decree by any court, agency or other governmental or quasi-governmental body, which, in either case, would have a material adverse effect on the Marks, the Products and Services or the operation or financial condition of either Party's business or that of their Affiliates.

### 9.7    Press Release and Marketing

Without limiting any confidentiality obligations of either Party set forth in this Agreement, Supplier shall not issue press releases, or otherwise advertise or market any information relating to any terms of this Agreement, the existence of this Agreement, or the existence of a relationship between the Parties, including mentioning or implying the name of Customer, or any of its affiliates, subsidiaries or personnel, without the prior written consent of Customer which consent may be given or withheld at Customer's sole discretion.  The provisions of this Section shall survive expiration or termination of this Agreement.

### 9.8    Intellectual Property

Except for Products bearing the trademarks, logos, trade dress or copyrighted material (the "Intellectual Property") of Customer, Supplier represents and warrants that it possesses all of the Intellectual Property rights pertaining to the Products (including, without limitation, the packaging, the container and the labelling). Supplier shall indemnify Customer against all claims, losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) concerning claims alleging that the Products or any part thereof or anything done by Supplier hereunder infringes any Intellectual Property right or knowhow of any third party. Such indemnification by Supplier shall not apply if Supplier is using Customer's Intellectual Property.  The provisions of this Section shall survive expiration or termination of this Agreement.

If any Intellectual Property is utilized in connection with the Products, all such Intellectual Property, as well as Intellectual Property relating to any development process, which has been provided to Supplier by Customer shall rest with Customer.  Products developed in cooperation between the Parties or by Supplier on behalf of Customer under the Agreement, constitute part of the Products and shall be Customer's sole property, including the right to amend and/or further develop, unless otherwise expressly agreed in writing.  All material handed over to Supplier by Customer is Customer's property and will be returned when delivery of Products has been completed unless otherwise agreed in writing between the Parties. This Agreement does not give Supplier any rights to use Customer's Intellectual Property in any way other than as specified in this Agreement.

### 9.9    Compliance with Laws

Supplier and Customer shall comply with any and all federal, state, local laws, regulations and ordinances as they may apply to the Products as well as to the terms and conditions of this Agreement ("Applicable Law").

## 10.  NOTICES

Any notice, consent, waiver or other communication required or permitted under this Agreement will be effective only if it is in writing and (i) personally delivered, or (ii) sent by a nationally or internationally recognized overnight delivery service (such as FedEx, UPS or DHL) to Supplier or Customer, as the case may be, addressed as set forth below (or to such other address as Supplier and Customer may hereafter designate by written notice provided in the manner aforesaid).  All

DocuSign Envelope ID: 5F4D14B2-32F5-4FAA-82B2-A8F75A57B342

such notices, consents, waivers or other communications will be deemed to have been given and received on the date of delivery.

**SUPPLIER:**                                    **CUSTOMER:**

**Goli Nutrition Inc.**                           **Circle K Procurement and Brands Ltd.**
1 Westmount Square, Suite 1500                   Circle K House, Beech Hill,
Westmount, Quebec, H3Z 2P9 Canada                Clonskeagh, Dublin 4, D04 Y016 Ireland
Attn: Legal Department                           Attn: Director of Global Procurement

## 11. GENERAL

### 11.1    Indemnification

Supplier agrees that it shall indemnify, defend (with counsel to be approved by Customer, such approval not to be unreasonably withheld), and protect Customer and its respective officers, directors, employees, parents, affiliates, franchisees and agents (the "Customer Indemnitees"), and hold the Customer Indemnitees harmless from any and all claims, penalties, demands, suits, causes of action, loss, cost, damage, expense, liability (including, without limitation, court costs and reasonable attorneys' fees actually incurred at customary hourly rates) ("Claims") incurred in connection with or arising at any time from (i) any matter concerning the Stores or Franchisees to the extent associated with the Products, or performance of providing services and/or Products to Stores or Franchisees, (ii) any Default by Supplier in the observance or performance of any of the terms, covenants, or conditions of this Agreement, (iii) any use of Supplier's Products and any information or materials provided by the Supplier with respect thereto, (iv) any breach of any representations or warranties made by Supplier under this Agreement, (v) any claims for personal or bodily injury, illness, death or property damage to the extent arising out of or resulting in any way from the Products or, any alleged defect in the Products, and (vi) any actual or threatened infringements, imitations or unauthorized use of  Supplier's Marks or intellectual property by third parties.

Supplier's duty to indemnify Customer Indemnitees shall survive termination or expiration of this Agreement with respect to any claims or liability occurring prior to such expiration or termination.

Notwithstanding anything in this Section to the contrary, Supplier shall not be obligated to indemnify Customer Indemnitees to the extent any such Claims are caused by the negligence, gross negligence, or intentional acts of Customer Indemnitees.

### 11.2    Insurance

So long as this Agreement is in effect, Supplier will, at its sole cost and expense, procure and keep in force at all times while this Agreement is in effect insurance for the following minimum types and limits: (a) Commercial Liability Insurance written on an "occurrence" basis with at least Two Million and no/ 100 Dollars ($2,000,000.00) per occurrence, and Eight Million and no/100

Dollars ($8,000,000.00) aggregate for bodily injury and property damage, and providing coverage not less than that of a standard commercial general liability policy including hazards of operations coverage, products/completed operations coverage. Requirements may be fulfilled through a combination of a commercial liability and an umbrella liability policy; (b) Comprehensive Automobile Liability Insurance, covering all hired, owned or otherwise operated non-owned vehicles with a minimum single limit of One Million and no/100 Dollars ($1,000,000.00) for bodily injury and property damages per occurrence; (c) Workers' Compensation Insurance as required by law; and (d) Employers Liability Insurance with a minimum limit of One Million and no/100 Dollars ($1,000,000.00) or an amount that satisfies statutory requirements (whichever is greater). Within ten (10) days after the Effective Date of this Agreement, and upon each policy renewal and from time to time thereafter, upon written request by Customer, Supplier shall cause the insurer issuing such policies, to issue a certificate to Customer confirming that such policies have been issued and are in full force and effect and provide coverage for Customer, and its respective parent, subsidiaries, Franchisees, agents, assigns, affiliates, employees, directors and officers as additional insureds. The policies shall also confirm that before any cancellation, modification, or reduction in coverage of such policies, the insurance company shall give thirty (30) calendar days advance written notice to Customer of such proposed cancellation, modification, or reduction, except for non-payment, in which case a ten (10) calendar day notification is required. Subject to the terms of this Agreement and excluding Customer contributory negligence or willful misconduct, Supplier waives for itself and its insurers all other rights of recovery against Customer for damages covered by such policies. Such policies shall include a clause expressly denying the insurer subrogation rights (except for Customer contributory negligence or willful misconduct) and providing that such policies are primary insurance and not excess over or contributory with any other valid, existing or applicable insurance carried by Customer, its parent, subsidiaries, affiliates, agents, assigns, employees, directors and officers, or Franchisees. All such policies shall be provided by an insurer rated A+ or better by AM Best Company. Supplier shall be responsible for any subcontractors hired to help Supplier fulfill its obligations under this Agreement. Supplier shall ensure that each subcontractor has adequate insurance and Supplier shall be responsible for the acts and/or omissions of its subcontractors.

### 11.3   Amendments / Modification

This Agreement may not be altered or modified unless by a written amendment or a revised Schedule to this Agreement, executed by all Parties.In the event of any proposed contract change; Supplier shall submit proposed changes in writing pursuant to the notice terms of the contract. Supplier and Customer will in good faith enter a 30 day negotiation period after which Customer will accept or reject, or extend the negotiation period. Any changes that the Customer accepts that result in needed product, package or assortment changes will be pursuant to the terms in article 1.2. Timing for such agreed changes will be set by the customer and cannot go into effect sooner than 60 days from the Customer acceptance.

### 11.4   Assignments / Subcontractors

Neither Supplier nor Customer may assign or transfer this Agreement or any obligations, or any part thereof, or any interest therein, to a third party without the other Party's prior written consent. Said consent will not be unreasonably withheld. Either Party may however assign, at its sole discretion, this Agreement in its entirety or in part, to any of its affiliates, parents, after-acquired companies or wholly-owned subsidiaries by giving the other Party a written notice.

Should Supplier need to subcontract any part of this Agreement, it shall obtain Customer's prior written consent. Such consent shall not relieve Supplier of any of its obligations or liabilities under

this Agreement and Supplier shall, in all cases, be responsible for the acts and omissions of any such subcontractor, agents and employees as though they were the acts and omissions of Supplier.

### 11.5    Audit, Inspection and Access Rights

Customer, in its sole discretion will have the right, but not the obligation, to inspect, examine and audit the records, data, practices and procedures ("Data") of Supplier, including any of its affiliates, subcontractors, or third parties providing Products under this Agreement, solely as such Data relates to Supplier's business dealings with Customer and Supplier's compliance with this Agreement.  Customer's inspection right shall include the right to inspect Supplier's facility(ies) where the Products are developed, manufactured, and/or stored.

Supplier shall provide all necessary assistance in connection with such audits.  Nothing herein shall create or impose any obligation upon Customer with respect to Supplier's obligations under this Agreement or Applicable Laws. Customer's right to audit shall not be deemed as express or implied oversight or control of Supplier's business or Supplier's business practices.

### 11.6    Dispute Resolution

Without limitation of the rights of the Parties in the event of a Default under this Agreement or any material dispute arising between the Parties hereto, the Parties shall attempt to resolve any controversy or claim that may arise between the Parties relating to this Agreement first by informal good faith negotiations with the Parties' respective senior management. If no amicable resolution is reached within a reasonable time period, the Parties may seek all available legal and equitable remedies.

In the event that a suit is brought or any attorney is retained to enforce any term of this Agreement or to collect any money due or monetary damages or equitable relief for breach, the prevailing Party is entitled to recover, in addition to all other available remedies, reimbursement for such reasonable attorney' fees, court costs, costs of investigation and all other related expenses.

### 11.7    Survival

Specified Sections of this Agreement expressly survive expiration or termination of this Agreement.  In addition, payment of any amounts due and owing, including, without limitation, the payment of Rebates shall survive expiration or termination of this Agreement, to the extent any such amounts are due and owing as of the expiration or termination date, or thereafter resulting from obligations of either Party under the terms of this Agreement.

### 11.8    Governing Law

This Agreement shall be governed and construed in accordance with the laws of the State of Arizona. All disputes arising under this Agreement shall be resolved by the state and federal courts located in Maricopa County, Arizona, the venue and jurisdiction of which the parties hereto consent and shall not be permitted to object.

### 11.9    Severability

If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then such provision shall be null and void, but other provisions will not be affected and shall be enforced to the full extent permitted by applicable law.

DocuSign Envelope ID: 5F4D14B2-32F5-4FAA-82B2-A5E75A57B342

### 11.10  Waivers

No waiver of any provision in this Agreement will be binding unless in writing and signed by both Parties. The failure of a Party to insist on the strict enforcement of any provision of this Agreement shall not constitute a waiver of the provision and all terms of the Agreement will remain in full force and effect.

### 11.11  Counterparts

This Agreement may be executed in counterparts (each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement) and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party. Furthermore, this Agreement may be executed and delivered by electronic transmission.

### 11.12  Entirety and Integration

This Agreement, together with any schedules, exhibits, or attachments to this Agreement or any other document incorporated herein by reference, sets forth the entire agreement and understandings between the Parties hereto with respect to the subject matter hereof. This Agreement supersedes all previous verbal and/or written discussions and negotiations between the Parties and supersedes and replaces any other agreement(s) that may have existed between Customer and Supplier, which both Customer and Supplier mutually agree is(are) hereby terminated and rendered void and of no further force and effect. Further, this Agreement may be executed and delivered in electronic form, such as facsimile or scanned email.

### 11.13  Headings

The sections or paragraph headings in this Agreement are for convenience only, shall in no way define or limit the scope or content of this Agreement, and shall not be considered in any construction or interpretation of this Agreement or any part hereof.

### 11.14  Relationship of the Parties and Non-Exclusivity

It is understood and agreed that each of the Parties is an independent entity and that neither Party is, nor shall be considered to be, an agent of the other. Neither Party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

Unless otherwise agreed to in writing, Supplier assumes full responsibility for the actions of all of its employees, subcontractors, or agents while performing the obligations under this Agreement.

This Agreement is non-exclusive, and either Party may enter into similar arrangements with other parties.

**[SIGNATURE PAGE FOLLOWS]**

**THE PARTIES** hereto have signed this Agreement as of the date first above written.

**Circle K Procurement & Brands Ltd.**

**Goli Nutrition Inc**

Per: _Matt Hieb_
A7BEDCFA95444CD...

Per: _Christa Cameron_
9FC5B959E41C4F2...

**Name:**    Matt Hieb

**Name:**    Christa Cameron

**Title:**    Vice President, Global Procurement

**Title**    VP B2B & Distribution

Per: _Liva Saule_
2C0E332447284F3...

**Name:**    Liva Saule

**Title:**    Director, Global Procurement

## SCHEDULE A (PRODUCTS & PRICES)

1. Subject to the terms and conditions herein, Supplier guarantees to Customer the following minimum velocity, after three (3) months from first in-store sale for specific UPCs (as further detailed below) up to a maximum of 4 SKUs and evaluated every quarter as an average of all stores by Business Unit ("BU") at $27.50 per SKU per store per week ("PSPW"), within the Territory ("**Guaranteed Obligation**"). Customer BUs must maintain MRP in order to qualify for Guaranteed Obligation (as further detailed below). During the warmup period of three (3) months from first in-store sale, Parties can mutually agree to discontinue a SKU due to poor performance.

Cost to Customer is $4.76/unit which then must be sold by Customer at $9.99/unit MRP, applicable to only those UPCs detailed below:

055840401951 (ACV)

055840401975 (ASW)

055840401999 (SF)

055840402019 (SG)

Supplier may request a cost increase and Customer can approve or reject in its sole discretion. Customer can increase MRP after a cost increase is mutually accepted by both Parties, for the purpose of maintaining a profit margin at fifty-two percent (52%), with the terms of the Guaranteed Obligation remaining in effect.

Customer will provide Supplier with a quarterly sales report, referencing only stores meeting the conditions set in Section 2 below, evaluated by BU as an average for each quarter (13 weeks). Such report must include the list of qualifying stores, as well as the UPCs scanning at each store. Supplier will confirm receipt of report and review details. If the Guaranteed Obligations set in this Section 1 are not met, Supplier will remit payment to each BU on N30 terms, representing fifty-two percent (52%) of the difference of A) the sum of the Guaranteed Obligations amount per SKU, for all applicable SKUs and B) the sum of the average per-SKU sale amount for all SKUs, based on the number of SKUs sold, for a period of thirteen (13) weeks.

For example, as an evaluated average for 13 weeks in the quarter, a Customer BU with 500 stores meeting the conditions outlined in Section 2, reports average sales of the following:

$40 PSPW for UPC 055840401951 (ACV)

$30 PSPW for UPC 055840401975 (ASW)

$15 PSPW for UPC 055840401999 (SF)

$20 PSPW for UPC 055840402019 (SG)

Of the 500 stores:

150 stores are scanning 2 SKUs

300 stores are scanning 3 SKUs

50 stores are scanning 4 SKUs

Upon review by Supplier, Supplier will be responsible for the remaining sales to meet the Guaranteed Obligation of $27.50 per SKU, for a combined total of $110.00 PSPW, based on a

52% margin. Following this example, the total amount owed by Supplier to the BU for the quarter would be $11,830 calculated as follows:

A = $27.50 x 4 SKUs = $110 PSPW

B = $40 + $30 + $15 + $20 = $105 PSPW

A – B = $5.00

52% of $5.00 = $2.60

50% x $2.60 x 150 stores carrying 2/4 SKUs x 13 weeks = $2,535

75% x $2.60 x 300 stores carrying 3/4 SKUs x 13 weeks = $7,605

100% x $2.60 x 50 stores carrying 4/4 SKUs x 13 weeks = $1,690

$2,535 + $7,605 + $1,690 = $11,830

This payment will be remitted to the BU within 30 days of sales report receipt.


2. This Guaranteed Obligation is to be a continuing guarantee and accordingly remain in force if Customer fulfills the following conditions:


 a) Apply MRP  for the Products within the Territory at $9.99/unit.


 b) Provide a Brand-block placement on-shelf for the SKUs; and


 c) In addition to placement on-shelf, provide Supplier an option to secure on a yearly basis the Queue Line and/or Checkout Counter placement in all of live Stores and Franchisees of Customer. Placement is determined by Customer BU.

## <u>SCHEDULE B (REBATES)</u>

**For any product that Supplier sells to Customer that is not a fully guaranteed sale, Supplier will remit 0% of total purchases to Customer within 30 days of the end of the quarter.**

Supplier agrees to pay for outside POS development and printing costs from GSP (or other approved Circle K POS provider), provided that Supplier approves the quote and final art work prior to printing and distribution of the material.

## SCHEDULE C
## Consumable Products
## Supplier Responsibilities and Commitments

### a. General

In addition to any warranties or similar requirements set forth in the Agreement, Supplier shall abide by all laws related to the production, distribution and/or sale consumable goods, including but not limited to the Food Safety Modernization Act and shall maintain written documentation of such compliance.

Supplier agrees to maintain a comprehensive food safety and quality assurance program; examples include, but are not limited to: hazard assessments and control plans (e.g. HACCP or HACCP-like plans), sanitation standard operating procedures (SSOP), Good Manufacturing Practices (GMPs), periodic facility audits (utilizing internal or external resources), pest and allergen control programs, equipment calibration schedules, etc.

In addition to maintaining a food safety and quality assurance program, Supplier shall be certified to a food safety standard that is recognized by the Global Food Safety Initiative (GFSI) and, upon request by Customer, shall provide copies of the GFSI recognized audit results and/or GFSI certification. If Supplier is not GFSI certified as of the Effective Date, Supplier, by entering into this Agreement, agrees that it shall work cooperatively with Customer towards achieving such certification within a reasonable timeframe.

Supplier agrees that all packaging and labeling shall be accurate, complete, and comply with all federal regulations. Except where specifically exempt, all food supplied to Customer shall have an ingredient statement on the label or be accompanied by an ingredient statement in the form of a sign, placard, flipchart, sticker, or other acceptable form of labeling. Ingredient statements must include major food allergens present or potentially present in the product. Upon request, Supplier agrees to provide documentation demonstrating the accuracy of labeling of products provided to, distributed to, and/or ordered by Customer. Where applicable, labels for products subject to Perishable Agricultural Commodities Act must include the country or countries of origin of the product and/or ingredients.

### b. Minimum Shelf Life Requirements

Supplier is required to provide Customer with fresh, in-date products. The minimum shelf life remaining to the distributor should be [405 days or 2/3rds of the total shelf life]. Customer expects Supplier to work collaboratively with them to meet these requirements.

### c. Quality and Food Safety

Supplier shall ensure that its employees, agents and subcontractors in each manufacturing facility comply with all applicable Federal, State, County, City, and other regulatory laws and building codes.

Supplier is further required to monitor and maintain compliance with changing laws and regulations. This includes, but is not limited to, the Food Safety and Modernization Act. Supplier acknowledges that while this legislation has been signed into law, it is subject to frequent changes and Supplier is responsible for awareness of and compliance with new rules, regulations, and industry best practices, as applicable.

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 5F4D14B232F54FAA83B2A5F75A57B342 | | Status: Completed |
| Subject: Please DocuSign: Goli contract to 2023.docx | | |
| Source Envelope: | | |
| Document Pages: 19 | Signatures: 3 | Envelope Originator: |
| Certificate Pages: 2 | Initials: 0 | Peter Perry |
| AutoNav: Enabled | | Schweigaards |
| EnvelopeId Stamping: Enabled | | Gate 16 |
| Time Zone: (UTC+01:00) Brussels, Copenhagen, Madrid, Paris | | Oslo,  0191 |
| | | pperry@circlek.com |
| | | IP Address: 37.228.201.41 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Peter Perry | Location: DocuSign |
|     1/19/2022 5:10:58 PM |     pperry@circlek.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Christa Cameron<br>christa@goli.com<br>Security Level: Email, Account Authentication (None) | *Christa Cameron*<br>9FC5B959E41C4F2...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 184.146.53.17 | Sent: 1/19/2022 5:15:08 PM<br>Viewed: 1/19/2022 5:18:14 PM<br>Signed: 1/20/2022 5:42:55 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Liva Saule<br>liva.saule@circlek.com<br>Director Global Procurement<br>Circle K Procurement & Brands Ltd<br>Security Level: Email, Account Authentication (None) | *Liva Saule*<br>2C0E332447284F5...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 37.228.209.121 | Sent: 1/20/2022 5:42:56 PM<br>Viewed: 1/20/2022 5:48:10 PM<br>Signed: 1/20/2022 5:56:42 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Matt Hieb<br>mhieb@Circlek.com<br>VP Global Procurement<br>Security Level: Email, Account Authentication (None) | *Matt Hieb*<br>A7BEDCFA95444CD...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 37.228.231.175 | Sent: 1/20/2022 5:56:43 PM<br>Viewed: 1/20/2022 6:17:44 PM<br>Signed: 1/20/2022 6:20:21 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/19/2022 5:15:08 PM |
| Certified Delivered | Security Checked | 1/20/2022 6:17:44 PM |
| Signing Complete | Security Checked | 1/20/2022 6:20:21 PM |
| Completed | Security Checked | 1/20/2022 6:20:21 PM |

| Payment Events | Status | Timestamps |
|---|---|---|